IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

TRISHA D. R.,[1]                        )
)
              Plaintiff,          )
)
vs.                             )   Civil No. 18-cv-1648-DGW[2]
)
COMMISSIONER OF SOCIAL       )
SECURITY,                  )
)
             Defendant.       )

## MEMORANDUM and ORDER

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB and SSI in September 2014, alleging a disability onset date of July 11, 2013. After holding an evidentiary hearing, an ALJ denied the application on August 11, 2017. (Tr. 32-47). The Appeals Council denied plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 1). Plaintiff exhausted her administrative remedies and filed a timely complaint with this Court.

## Issue Raised by Plaintiff

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 9, 24.

Plaintiff raises the following points:

1.      The ALJ erred in finding that plaintiff's epilepsy and narcolepsy with cataplectic spells did not meet the requirements of Listings 11.02A and 11.02B.

2.      The ALJ erred in accepting the state agency reviewers' opinions and in rejecting the opinion of Dr. Alam, her treating neurologist.

## **Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3]   Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work?   20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled.   A negative answer at any step, other than at step 3, precludes

_____

[3]  The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes and regulations are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

a finding of disability. The plaintiff bears the burden of proof at steps 1–4. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 2019 WL 1428885, at *3 (S. Ct. Apr. 1, 2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921

(7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. She was insured for DIB through December 31, 2016.[4] The ALJ found that plaintiff had severe impairments of narcolepsy, obstructive sleep apnea, epilepsy/catalepsy, polycystic ovarian syndrome, depression, and anxiety disorder. The ALJ concluded that these impairments did not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to do work at all exertional levels, with nonexertional physical limitations consisting of (1) no climbing of ladders, ropes, or scaffolds; (2) only occasional climbing of ramps and stairs; (3) no operation of motor vehicles; and (4) avoiding exposure to unprotected heights and even moderate exposure to hazards such as moving machinery or open flames. He also assessed mental limitations which are not in issue.

The ALJ found that plaintiff could not do her past relevant work as a janitor or switchboard operator. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because she was able to do other jobs that exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in

---

[4] The date last insured is relevant only to the claim for DIB.

formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff. As plaintiff's points relate only to her epilepsy/narcolepsy, the Court will focus on that evidence.

### 1.    Agency Forms

Plaintiff was born in 1977 and was 39 years old on the date of the ALJ's decision. (Tr. 263). She said she was disabled because of narcolepsy, polycystic ovarian syndrome, and depression. She was 5'6" tall and weighed 228 pounds. She said she was let go from her last job in July 2013 because she took naps on the job. She had completed four years of college and had worked as a janitor and a switchboard operator. (Tr. 267-268).

In December 2014, plaintiff reported that she could not get a job "because of the cataplexy and falling asleep." (Tr. 277).[5]

Plaintiff's mother and "adopted aunt" submitted function reports, but neither report described plaintiff's seizures. (Tr. 300-307, 335-343).

### 2.    Evidentiary Hearing

Plaintiff was represented by an attorney at the hearing in May 2017. (Tr. 55).

Plaintiff lived with her husband. (Tr. 68). She said she did no household chores because she had no energy due to narcolepsy. (Tr. 72).

Plaintiff testified that the primary reason that she could not work was that

---

[5] "Narcolepsy is a chronic sleep disorder characterized by overwhelming daytime drowsiness and sudden attacks of sleep. . . . Sometimes, narcolepsy can be accompanied by a sudden loss of muscle tone (cataplexy), which can be triggered by strong emotion." https://www.mayoclinic.org/diseases -conditions/narcolepsy/symptoms-causes/syc-20375497, visited on June 4, 2019.

she had seizures.   She had had seizures off and on since she was a child, but they had gotten worse over the last three years.   She took Keppra, which helped, but she still had two or three seizures a month.   She had been having two or three seizures a month for the past three years.   She estimated that her seizures lasted six minutes.   She felt tired and had a bad headache after a seizure.   (Tr. 70-71).

Plaintiff also had cataplexic attacks as a side effect of narcolepsy.   She described these attacks as "my emotion[s] or my anxiety gets up [and] I [lose][6] all muscle control and will fall, can't keep my eyes open, can't keep by head up, can't speak, and it can last anywhere from 10 to 20 minutes."   She was conscious during these attacks.   (Tr. 76-77).

Dr. Alam completed a medical source statement for her.   She then went back to him and asked him to reconsider his answer to question number 14 because it "contradicted" his answers to other questions.   He looked back at her statements in her medical records about how many seizures she said she had and changed his answer.   (Tr. 77-78).

A vocational expert (VE) also testified.   The ALJ asked her a hypothetical question which corresponded to the RFC assessment.   The VE testified that this person could not do plaintiff's past work, but she could do other jobs that exist in substantial numbers in the national economy.   If she were to be absent from work more than nine to twelve one day a year, she would be unemployable.   (Tr. 79-82).

**3.    Prior Denial**

A prior application was denied by a different ALJ in May 2013.   (Tr.

---

[6] The transcript says "use," but the context indicates that plaintiff said "lose."   See, Tr. 77.

119-131).

### 4.    Relevant Medical Records

Plaintiff saw her primary care provider in November 2013.   On the review of systems, she denied seizures.   On exam, her gait, station, motor strength, and movement of all extremities were normal.   (Tr. 421-423).   In May 2014, she denied any recent episodes of cataplexy.   (Tr. 415).   In September 2014, the month in which she applied for disability benefits, she denied loss of consciousness or balance, falls, and weakness.   Physical exam was normal.   (Tr. 408-412).

In November 2014, plaintiff complained to her primary care provider of episodes where she was tired, something caused her to laugh, and she lost muscle control and strength.   This had just started in the past few months.   She said she had seizures as child.   She was referred to Dr. Alam.   (Tr. 404-407).

Plaintiff first saw Dr. Fakhre Alam, a neurologist, in November 2014 for evaluation of possible seizures.   She said she had been having "recent episodes that she feels are not seizures."   She would be aware of her surroundings but not able to respond.   She would not pass out.   She thought these were cataplectic attacks and not seizures.   Her mother stated that plaintiff had tonic clonic seizures as a child and said that these recent spells were different.   She was not on any medication for cataplexy.   Dr. Alam noted that her current spells did not sound like epileptic seizures.   He prescribed Protriptyline for cataplectic spells.   (Tr. 452-453).   An EEG was normal except for a single sharp right frontotemporal spike.   The clinical significant of the spike was unclear.   (Tr. 436).

In January 2015, Dr. Alam noted that the spike seen on the EEG was

"nonspecific." Plaintiff said that Protriptyline helped to some extent. She denied any tonic clonic activity or loss of consciousness. The dosage of Protriptyline was increased. The assessment was epilepsy without intractable epilepsy, and narcolepsy with catalepsy. In April, she said she had two to three "seizure episodes weekly." (Tr. 561-563).

In June 2015, plaintiff reported to Dr. Alam that she had a seizure two days earlier. She told him that she was applying for disability and she would need a "letter dictated soon for her seizure disorder." (Tr. 567).

In July 2015, told Dr. Alam that she had no seizures since June, but she had eight cataplexy attacks. He increased the dosage of Protriptyline. (Tr. 571-572).

At a visit with her primary care provider in September 2015, plaintiff reported doing well. Her physical exam was normal. (Tr. 681-682). In November, she said she was taking her narcolepsy medication and she was stable, although she had an attack of cataplexy the prior week while laughing. (Tr. 678).

In December 2015, plaintiff told Dr. Alam that none of her medications were working and Protriptyline was making her sleepy. She said she had cataplexy attacks at least twice a week. The dosage of Protriptyline was decreased. (Tr. 575-576). One month later, she told Dr. Alam that she had two "seizures" since the last visit. She said "the medication is working since she usually has two or three seizures per week." She also said she was having "cataplexy attacks" at least twice a week. (Tr. 598-599).

Plaintiff returned to her primary care provider in March 2016. She had been out of medications for a few weeks because she changed insurance to a

8

"medical card," i.e., Medicaid. She said her narcolepsy medications had been "helping with cataplexy." The doctor wrote that they would "try to resume previous meds [for cataplexy and narcolepsy] as has been controlling sx [symptoms]." (Tr. 671-672).

In May 2016, plaintiff told Dr. Alam that she had to change to Medicaid and was having difficulty getting her medications approved. She had been out of her epilepsy and narcolepsy medications, but she had apparently gotten the narcolepsy medication filled recently. She reported three seizures since the last visit in January and said her cataplexy attacks had decreased. He increased the dosage of Keppra due to recent seizures. There were no notes of abnormal findings on physical exam. (Tr. 600-602). In August she said she still had two to three "seizures" a week and she did not feel her condition had improved much. The doctor also wrote that she had one to two seizures "in the interval." He increased the dosage of her medications. (Tr. 604-606).

In August 2016, plaintiff told her primary care provider that she was still having episodes of cataplexy, but they were less severe. The doctor noted she was "[d]oing well if takes meds." Physical exam was normal. (Tr. 657-658). In October 2016 she told the doctor that her narcolepsy medication "seems to be helping." (Tr. 653).

In November 2016, plaintiff told Dr. Alam that she had five to six seizures a month. The seizures lasted about three minutes and she continued to "experience symptoms" for six to fifteen minutes. She said that, during a seizure, she experienced stiffening of the body, glazed eyes, biting of the tongue, and loss of

9

bladder control.  She wanted to discuss medication changes.  He increased the dosage of Keppra.  (Tr. 607-608).

In February 2017, plaintiff reported to Dr. Alam that she continued to have one to two "seizures" per week.  They lasted a few seconds and she denied any biting of the tongue or foaming at the mouth.  The dosage of Keppra was increased. (Tr. 610-611).

Plaintiff reported to her primary care provider in March 2017 that she was taking her narcolepsy medications regularly.  She denied any weakness, numbness, dizziness, or loss of consciousness.  Physical exam was normal.  The doctor described her cataplexy and narcolepsy as stable with medications.  (Tr. 638-639).

Plaintiff saw Dr. Alam twice in March 2017.  On March 16, she saw him "to fill out disability paperwork."  She said that she continued to have one to two seizures a week.  Her last seizure was two days prior; it lasted a few minutes and she had loss of bladder control.  Dr. Alam wrote that she had three to four seizures so far in 2017.  He increased the dosage of Keppra.  She was to return in three months.  (Tr. 743-744).

On that same date, Dr. Alam completed a form entitled "medical statement regarding seizures."  He indicated that plaintiff had "generalized seizures."  He did not check the box for "generalized tonic-clonic seizures."  He said that plaintiff had seizures a few times a year and had cataleptic spells about once a week.  She was compliant with her treatment and had no significant side effects from medications.  (Tr. 761-762).

10

On March 16, 2017, Dr. Alam also completed the first of two versions of a form in which he assessed plaintiff's RFC. He said that he was treating her for epilepsy and narcolepsy with cataplexy and that his diagnoses were based on an EEG. He said that she could stand and/or walk for 8 hours a day but could not sit for even an hour a day. She could frequently do postural activities and could lift and carry up to 50 pounds. She did not complain of pain. Question number 14 asked "Would your patient be likely to miss work two or more days per month due to his/her impairments? If so why?" On March 16, 2017, Dr. Alam answered "no." (Tr. 735-739).

Plaintiff returned to Dr. Alam with her parents on March 30, 2017, for "an early follow up to make corrections on disability paperwork." She said that she had a seizure on March 28. She said she had three to four seizures in 2017 and had cataplectic spells up to once a week. He raised the dosage of Keppra and Protriptyline. (Tr. 740-742).

On May 1, 2017, a little over two weeks before the hearing, Dr. Alam changed his answer to Question number 14. He scratched out the "no" and wrote "yes." He then wrote, "She has been having 2-3 seizures a month & several headaches a month. She is likely to miss her work more than 2-3 times a month." (Tr. 739). There is no indication that Dr. Alam saw plaintiff between March 30 and May 1, 2017.

**5.    State agency reviewers' opinions**

A state agency consultant assessed plaintiff's physical RFC based on a review of the record in March 2015. He concluded that plaintiff had no exertional

limitations. She had the nonexertional limitations adopted by the ALJ in his RFC assessment. Among other records, this doctor reviewed the primary care provider's records from November 2014 indicating that plaintiff had a history of narcolepsy and was having cataplectic episodes, as well as Dr. Alam's office note from January 2015. (Tr. 148-150).

In August 2015, a second state agency consultant reviewed the record and agreed with the first reviewer's opinion. (Tr. 164-166).

### Analysis

Plaintiff first argues that it was error for the ALJ to find that her epilepsy and narcolepsy with cataplectic spells did not meet the requirements of Listings 11.02A and 11.02B.

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled. In order to be found presumptively disabled, the claimant must meet all of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis." 20 C.F.R. §404.1525(d). The claimant bears the burden of proving that she meets or equals a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

The 11.00 series of the Listings covers neurological disorders. The Listings under Paragraph 11.02 concern epilepsy. "Epilepsy is a pattern of recurrent and unprovoked seizures that are manifestations of abnormal electrical activity in the brain." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, ¶ 11.00H.1. Two kinds of seizures are caused by epilepsy. "Generalized tonic-clonic seizures are characterized by

loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions)."   ¶11.00H.1.a. "Dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control. During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) may occur."   ¶ 11.00H.1.b.   Paragraph 11.00H.2 provides "We require at least one detailed description of your seizures from someone, preferably a medical professional, who has observed at least one of your typical seizures. If you experience more than one type of seizure, we require a description of each type."

> The requirements of Listing 11.02A & B are:
>
> 11.02 Epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:[7]
>
> A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or
>
> B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)[.]

20 C.F.R. § Pt. 404, Subpt. P, App. 1., ¶ 11.02.

There is no specific listing for narcolepsy.   However, the agency's Program Operations Manual System (POMS) provides in Section DI 24580.005 that "Although narcolepsy and epilepsy are not truly comparable illnesses, when evaluating medical severity, the closest listing to equate narcolepsy with is Listing

---

[7] Plaintiff does not argue that she meets or equals the requirements of Listing 11.02C or D.

11.02, Epilepsy."[8]   That section of POMS describes narcolepsy as

> [A] chronic neurological disorder characterized by recurrent periods of an irresistible urge to sleep accompanied by three accessory events:
>
> 1. Cataplexy—attacks of loss of muscle tone, sometimes with actual collapse, during which the individual always remains conscious.
>
> 2. Hypnagogic hallucinations—hallucinations which occur between sleep and wakening.
>
> 3. Sleep paralysis—a transient sensation of being unable to move while drifting into sleep or upon awakening. In addition, some persons have periods of automatic behavior and most have disturbed nocturnal sleep.

https://secure.ssa.gov/poms.nsf/lnx/0424580005, visited on June 7, 2019.

The ALJ's discussion of the Listings is at Tr. 35.   He stated that the record does not establish the signs, symptoms, lab findings or degree of functional limitation needed to meet or equal a Listing.   He noted that no doctor opined that plaintiff met or equaled a Listing.   He specifically discussed whether plaintiff's epilepsy or narcolepsy met or equaled Listing 11.02, concluding that they did not because the record did not demonstrate that plaintiff had tonic-clonic seizures once a month or dyscognitive seizures once a week for three consecutive months despite adherence to prescribed treatment.

Plaintiff argues that she met the requirements of both A and B based on her reports to Dr. Alam of the frequency of her seizures.   She argues that the ALJ ignored "all evidence" and made no mention of the frequency of her seizures in discussing the Listings.   Doc. 20, pp. 8-9.

Plaintiff's claim that the ALJ ignored the evidence borders on frivolous.   The

---

[8] POMS is an internal agency manual.  It is not a regulation and has no legal force. *Parker for Lamon v. Sullivan*, 891 F.2d 185, 190 (7th Cir. 1989).

ALJ discussed the medical evidence in detail, including her statements as to the frequency of her seizures, at Tr. 39-43. There is no requirement that this discussion appear in the same section as the discussion of the Listings. Rather, the ALJ's decision must be read as a whole. *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015).

Plaintiff's argument does not come close to carrying her burden of showing that she met or equaled a Listing. First, as she recognizes, Listing 11.02 requires a detailed description of a typical seizure. The record here contains no such detailed description from anyone, much less from a medical professional. Further, there is no evidence that she ever suffered a tonic clonic seizure during the period at issue. Plaintiff denied tonic clonic activity as well as loss of consciousness, and Dr. Alam indicated on his "medical statement regarding seizures" that she had "generalized seizures" but not "generalized tonic-clonic seizures." Therefore, there is no evidence that her condition meets or equals Listing 11.02A.

As for Listing 11.02B, plaintiff's argument simply assumes that her cataplectic spells can be counted as dyscognitive seizures for purposes of the Listing. However, they are not the same thing. Dyscognitive seizures involve an alteration of consciousness, while cataplectic spells do not. POMS Section DI 24580.005 recognizes that "narcolepsy and epilepsy are not truly comparable illnesses. . . ." Thus, while the agency's internal manual directs the ALJ to consider narcolepsy under the epilepsy Listings, it does not instruct the ALJ to count cataplectic spells as epileptic seizures.

Plaintiff cites no authority for her assumption that cataplectic spells can be counted as dyscognitive seizures for purposes of 11.02B. There may be situations in which the effects of cataplectic spells are severe enough to equal the effects of dyscognitive seizures, but plaintiff does not point to anything in the record to establish that this is the case here. And, the record contains neither a "detailed description of your seizures from someone, preferably a medical professional, who has observed at least one of your typical seizures" as required by Paragraph 11.00H.2, nor a description from an ongoing treatment source of "the medications used and the response to the medication, as well as an adequate description of the claimant's alleged narcoleptic attacks and any other secondary events such as cataplexy, hypnagogic hallucinations or sleep paralysis" as required by POMS DI 24580.005(C). Plaintiff was represented by counsel at the agency level, and it can be assumed that she put forth her best case for benefits. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007).

Plaintiff also takes issue with the ALJ's weighing of the opinions of the state agency consultants and Dr. Alam.

Plaintiff argues that it was error to give "great weight" to the state agency consultants' opinions because they reviewed the record early on, before plaintiff had even had an epileptic seizure. "An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), as amended on reh'g (Apr. 13, 2018). See also, *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018). The problem

here is that plaintiff points to no later medical evidence that was likely to have changed the consultants' opinions regarding her RFC. The state agency consultants were aware that plaintiff had narcolepsy and experienced cataplectic spells. Plaintiff does not identify any limitations beyond those assessed by the ALJ that she contends would be required to accommodate her epilepsy. Further, Dr. Alam indicated that she only had seizures, as opposed to cataplectic spells, a few times a year, and that she did not have tonic clonic seizures. (Tr. 761).

Plaintiff also argues that the ALJ erred in not giving greater weight to Dr. Alam's opinion.

Although Dr. Alam treated plaintiff, the ALJ was not required to fully credit his opinion because of that status; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). A treating source's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Plaintiff's application was filed before March 27, 2017. The applicable regulation, 20 C.F.R. § 404.1527(c)(2), provides, in part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your

> impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. [Emphasis added]

If the ALJ decides not to give the opinion controlling weight, he is to weigh it applying the factors set forth in § 404.1527(c)(1)-(6). Supportability and consistency are two important factors to be considered in weighing medical opinions. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques [,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).

Here, the ALJ explained in detail why he gave "very little weight" to Dr. Alam's opinion, noting the ways in which it was unsupported by or conflicted with the medical evidence. For instance, although physical exams regularly showed normal findings, Dr. Alam said that plaintiff could not sit for even one hour a day. Dr. Alam said plaintiff was compliant in taking her medication as prescribed, but there were no lab tests checking for therapeutic drug levels in her system, so his conclusion must have relied on plaintiff's statements and not on objective medical evidence. And, most seriously, Dr. Alam evidently changed his answer to question number 14 at plaintiff's urging and not based on any medical observation of his own. An ALJ may discount a doctor's opinion that is based solely on the claimant's subjective complaints. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

In light of the deferential standard of judicial review, the ALJ is required only

to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The Court finds that the ALJ easily met the minimal articulation standard here.

This is not a case in which the ALJ failed to discuss evidence favorable to the plaintiff or misconstrued the medical evidence. Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence. She has not identified a sufficient reason to overturn the ALJ's conclusion.

Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:  June 11, 2019.**

**DONALD G. WILKERSON**
**U.S. MAGISTRATE JUDGE**